**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| REGAN EASTERBROOK KIRKLAND, | ) | CASE NO. 5:20-cv-2480 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| *Acting Comm'r of Soc. Sec.*, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Regan Easterbrook Kirkland (Plaintiff or Kirkland), challenges the final decision of Defendant Kilolo Kijakazi, Acting Commissioner of Social Security (Commissioner),[1] denying her application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423 *et seq*. (Act). This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision REVERSED and REMANDED for proceedings consistent with this opinion.

**I. Procedural History**

On May 23, 2018, Plaintiff applied for DIB, alleging a disability onset date of March 15, 2017. (R. 11 PageID# 233, Transcript (Tr.) 170). The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge (ALJ).

---

[1] Pursuant to Rule 25(d), the previous "officer's successor is automatically substituted as a party." Fed.R.Civ.P. 25(d).

(Tr. 103-105, 107-109, 114-115). Plaintiff participated in the hearing on January 23, 2020, was represented by counsel, and testified. (Tr. 24-66). A vocational expert (VE) also participated and testified. *Id*. On February 6, 2020, the ALJ found Plaintiff not disabled. (Tr. 7-18). The Appeals Council denied Plaintiff's request to review the ALJ's decision on August 30, 2020, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-3).

Plaintiff's complaint challenges the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 12, 16, 17). Plaintiff asserts the following assignments of error: 1) "The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the Separation of Powers[, and] the decision in this case by an ALJ who derived his authority from Andrew Saul is constitutionally defective[;]" 2) The ALJ erred when forming the residual functional capacity (RFC) by failing "to properly evaluate the totality of the evidence in the record in accordance with the applicable Listings and Rulings[;]" and 3) "The ALJ erred in his determination regarding credibility as it was not supported by substantial evidence and violated Social Security Ruling 16-3p." (R.12, PageID# 1776).

## II. Evidence

**A. Relevant Medical Evidence**[2]

1. **Treatment Records**

Jonathon Raddish, APRN, CNP began treating Plaintiff for neck and back pain management before her alleged onset date and continued through her June 30, 2018 date last insured (DLI). (*See., e.g.,* Tr. 604-608). In March 2017, APRN Raddish prescribed narcotic

---

[2] The recitation of the evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties in their briefs and also deemed relevant by the court to the assignments of error raised.

2

medication, in addition to trigger point injections in Plaintiff's trapezius and rhombus, providing Plaintiff a week of pain relief. (Tr. 440, 614, 616-17, 627-28). APRN Raddish also observed claimant was 5'2" tall and weighed 250 pounds with a BMI of 45.71. (Tr. 624). Plaintiff's left knee osteoarthritis appeared in an x-ray in March 2017, and MRI of Plaintiff's left knee confirmed tricompartmental osteoarthritis, large knee joint effusion with synovitis, radial tear at the posterior horn medial meniscus adjacent to the posterior root and sublexxed and tilted patella on April 4, 2017. (Tr. 271-73, 499-501). One day later, on April 5, 2017, Raddish noted Plaintiff "saw Dr. Peiffer for left knee pain and got an injection" and described Plaintiff as having a normal gait. (Tr. 634, 637). However, on April 20, 2017, Jeffrey R. Peiffer, D.O., indicated Plaintiff did not respond to joint injections, diagnosed derangement, left knee, and recommended Plaintiff "use crutches assisted weightbearing" to help her gait. (Tr. 434-35). Plaintiff expressed concern about the feasibility of using crutches and the record notes she relied upon a cane to minimize her antalgic gait and loading of the medial compartment of her knee. (Tr. 430, 436).

On May 8, 2017, Dr. Kantaras noted Plaintiff "is continuing to exhibit symptoms that have not improved with non operative care. The symptoms are significant and at times interfere with daily activities." (Tr. 860). Dr. Kantaras also observed Plaintiff had a left knee small effusion, positive McMurray's test along the left medial joint, mild antalgic gait, normal alignment, full leg extensions, decreased flexion and crepitus in her left leg and knee, and performed a left knee arthroscopy with partial medial meniscectomy in late May 2017. (Tr. 429, 432-33, *see also* Tr. 861-62). Following the arthroscopic surgery, Plaintiff experienced significant left knee post-operative pain and swelling and lead to corticosteroid injection on June 19, 2017. (Tr. 425, 429, *see* also 860-65). During this same timeframe, from May 2017 through June 2018 (DLI), APRN Raddish documented his treatment in similar month-to month examination records, describing

Plaintiff's left knee decreased range of motion, swelling and tenderness, antalgic/abnormal gait and use of a cane. (Tr. 652-53, 661-662, 672-73, 681, 691, 729, 740, 751, 763, 775).

Plaintiff received only short-term relief from a July 27, 2017 left genicular nerve block and narcotic pain medication. (Tr. 420). On July 31, 2017, Dr. Kantaras noted Plaintiff's left knee osteoarthritis and "ADL's [activities of daily living] have become more difficult including but not limited to decrease ability to ambulate." (Tr. 865). Dr. Kantaras performed a left total knee arthroplasty, and biopsy testing confirmed fibrocartilaginous tissue with degenerative/reactive features and reactive synovium consistent with osteoarthritis and fibrosis on October 19, 2017. (Tr. 368-369, 485-87). Plaintiff received training on wheeled walker management, and Dr. Kantaras discharged Plaintiff on October 21, 2017, for home-based therapy. (Tr. 386, 394-400).

On November 29, 2017, Plaintiff presented to physical therapy with right knee pain and observable inflammation, which she attributed to overcompensating for the left side of her body. (Tr. 353). December 2017 physical therapy records report that Plaintiff could not tolerate therapy exercises and she ambulated with an assisted device. (Tr. 347-49). However, Dr. Kantaras observed, "[h]er gait has improved tremendously and is not relying on assistive walking aids" on December 11, 2017. (Tr. 266, 349). Dr. Kantaras described Plaintiff's range of motion and muscle strength as improved, but her progress plateaued, and he performed a left knee manipulation on December 15, 2017, followed by additional physical therapy three-to-five times per week. (Tr. 266, 336-37). Plaintiff remained unable to reach end ranges of flexion and extension on December 26, 2017. (Tr. 332).

Starting in January 2018, Plaintiff attended physical therapy every three-to-four days and her mobility decreased as her right knee pain increased. (Tr. 301, 308, 313-18, 330-37). A May 15, 2018, MRI of Plaintiff's right knee showed mild medial and patellofemoral compartment

4

osteoarthritis with an oblique tear at the anterior horn medial meniscus contacting the inferior articular surface; Dr. Kantaras diagnosed Plaintiff as having primary osteoarthritis of the right knee. (Tr. 301, 478).

Beginning in May 2018, APRN Raddish also provided physical examination observations for Plaintiff's right knee, which included decreased range of motion, swelling, and tenderness. (Tr. 763, 775). Plaintiff was still using a cane on June 29, 2018. (Tr. 775).

On June 1, 2018, Paul Wilkie, M.D. documented Plaintiff's gait was "antalgic, steady and well-balanced with a cane, in a flexed stooped posture." (Tr. 293). Dr. Wilkie concluded "[l]eading diagnosis is chronic pain syndrome versus a CRPS picture as her pain appears to be significantly out of proportion. She has been on chronic narcotic pain medications." (Tr. 294). A bone scan showed "[s]tatus post left knee arthroplasty, with scintigraphic findings raising concern for prosthetic loosening or infection" on June 11, 2018. (Tr. 476-77).

On August 24, 2018, Dr. Kantaras performed an arthroscopy of the right knee with partial medial meniscectomy and chondroplasty; following that the Plaintiff continued to require ambulatory aids. (Tr. 1343-51).

**2. Medical Opinions Concerning Plaintiff's Functional Limitations**

On August 2, 2018, State agency physician Gerald Klyop, M.D. completed a medical evaluation of the record and opined that Plaintiff could lift and/or carry 10 pounds frequently and 20 pounds occasionally, stand and/or walk four hours, and sit about six hours in an eight-hour workday. (Tr. 80-81). Dr. Klyop opined Plaintiff had an unlimited ability to push and/or pull other than shown for lift and/or carry, could frequently climb ramps/stairs, and never climb ladders, ropes or scaffolds. (Tr. 81). Dr. Klyop opined—that due to pain and spasm throughout her spine and osteoarthritis of her knee—Plaintiff was reduced to frequently balance, stoop,

kneel, crouch and crawl, she should avoid unprotected heights and heavy machinery, but otherwise had an unlimited ability to be exposed to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases and poor ventilation. (Tr. 81-82). State Agency medical consultant Kirkland Bolz, M.D., affirmed this opinion on January 14, 2019, concluding the administrative medical findings from the initial claim were consistent with and supported by the overall findings. (Tr. 95-97).

On October 2, 2018, consultative psychologist E.M. Bard, Ph.D., opined, Plaintiff had no limitations in her ability to understand and remember instructions. (Tr. 876). Dr. Bard opined Plaintiff had no significant limitations in sustaining concentration, attention and persistence. *Id*. Lastly, Dr. Bard opined Plaintiff had no forensic history that indicated problems dealing with authority figures and no significant limitations in her ability to deal with anticipated pressures in the competitive work setting. *Id*.

On October 18, 2018, State Agency psychological consultant Courtney Zeune, Psy.D. opined Plaintiff had a mild limitation in her ability to understand, remember or apply information, and otherwise had no limitations in her ability to interact with others, concentrate, persist or maintain pace and adapt and manage herself. (Tr. 78). Dr. Zeune concluded Plaintiff's medically determinable depressive disorder resulted in no more than mild limitations and Plaintiff's ability to perform activities of daily living was intact, within her physical functioning. (Tr. 78-79).

On January 14, 2019, State Agency psychological, Kristen Haskins, Psy.D., affirmed this opinion. (Tr. 93).

6

### 3. Non-Medical Opinions

On January 15, 2020, Plaintiff's husband, William Kirkland, provided an Adult-Third Party Function Report. (Tr. 258). Mr. Kirkland described Plaintiff as having a limited ability to sit, stand, walk and sleep, and she needed a cane. (Tr. 258, 263-34). He commented that prescription medication makes her drowsy and limits her ability to drive and focus. *Id.* He said Plaintiff could do laundry, let out the dogs, attend appointments, do very limited shopping, and prepare simple, frozen meals. (Tr. 259-61). Mr. Kirkland described Plaintiff as capable of getting their children on the bus, and he otherwise handles all afternoon school functions, cooking, cleaning and activities. (Tr. 259). He commented that Plaintiff is able to use a phone and computer and does not go anywhere on a regular basis. (Tr. 262). He has observed her problems getting along with others due to frustration with herself/pain and short temper, in addition to having little tolerance for stress and increased fears. (Tr. 264).

### B. Relevant Hearing Testimony

At the January 23, 2020 hearing, Plaintiff testified as follows:

- She is right-handed; experienced weight gain; and spends one-to-two hours per week at her child's school, as a nurse, reviewing records. (Tr. 31)

- She maintains a driver's license. She tries to keep trips to 15-to-20 minutes and then she is "not out very long" because "she can't handle it." The drive to the hearing took 35 minutes. Once out of the car, she had to make several stops, either to just "hold on" or to sit if a seat was available. (Tr. 32-3).

- She has a bachelor's degree in "psychology and elementary education" and an associate degree for nursing. (Tr. 34).

- She worked from 2007-2011 as an emergency room registered nurse at the Cleveland Clinic. *Id.* When she stopped working at the Cleveland Clinic in 2017, she started work as a nurse at the College of Wooster because it allowed her to work the night shift a few days a week, and allowed her to try to be home, make dinner, and be there for her children. (Tr. 36). She worked the night shift by herself. She could not walk and would

7

need to sit and ice her knee due to pain and swelling. As a result, she could not perform her job duties. (Tr. 37).

- Plaintiff had a left knee arthroscopy, followed by a left total knee replacement in October 2017. Her left knee then required manipulation to improve range of motion. (Tr. 35-6).

- Her right knee pain began in February or March 2018, caused falls and culminated in a total knee replacement of the right knee in August 2018. (Tr. 35-8).

- Her functioning went "downhill" since having her first knee replacement surgery. (Tr. 37-8).

- She started using a cane in April 2017 and has not stopped using one, except when she used a walker after her August 2018 surgery. (Tr. 39). She was using the cane to walk around at home, unless she could "hang onto the wall" or her daughter could assist her. *Id*. Her pain and knee swelling never went away and Percocet only dulled the pain. *Id*. She took pain medication for her knee and back. She wakes with movement in her sleep. (Tr. 40). Pain medication prevented her from going anywhere or doing anything. (Tr. 40-41). She did not tolerate knee injections. (Tr. 43).

- Sitting in a recliner and using an ice bath machine provide relief, and having her legs down causes swelling. (Tr. 41).

- She had some increased range of motion in her knees with physical therapy but stopped attending when improvement plateaued, and she did the exercises at home. Walking and climbing stairs was still difficult, so she continued to crawl up and down the stairs.

- She has been in pain management for her back since 2011, and did not find physical therapy helpful for her back. (Tr. 43-44).

- She has a restless body and experiences whole body shaking that increases by 8:00 p.m. (Tr. 44-45).

- She takes antidepressants and has discussed her depression with providers. (Tr. 46). She struggled and had difficulty focusing in 2017 and 2018. She specifically stopped working because of physical pain, but if she went back to work, her depression and anxiety would hinder her abilities to do work. When she is stressed, she experiences chest pain, becomes forgetful, and is weepy. (Tr. 46-48).

- In 2018, she typically woke by 6:00 a.m., and her back would be "so tight," she could not breathe or walk. Once she "got that under control," she woke her children. Her older daughter took over responsibilities of getting her younger child dressed. She used a chair to prepare breakfast. When the children went to school, she either got ready for

8

    physical therapy or she sat in the recliner with her legs up and iced her knees for 20 minutes on and 20 minutes off, continuing to do so throughout the day. (Tr. 49-50).

- She shopped for groceries every three weeks and then would be "down and out for several days." She could wash off the counter and sporadically do the dishes; she could perform some cooking, using mostly instant meals; and her husband and daughter performed the rest of household chores and cooking. (Tr. 52).

- Her husband drove her to therapy in the first several weeks after surgery and then she drove herself because she does not have anybody that could have helped her. *Id.*

- In 2018, she attended one school activity, with her husband, where she was able to sit. (Tr. 54). If she attended a sporting event, it had to be in a field less than 20 feet away from her parking spot. (Tr. 55). She infrequently went to dinner, choosing restaurants with available handicap parking in front, and stayed less than an hour. (Tr. 54).

- Lasix caused frequent urination. (Tr. 56).

- She cannot sit or lay down for long periods because of stiffness when she stands, and she has fallen several times in and outside of her home. (Tr. 57).

During the administrative hearing, the ALJ posed the following hypothetical question to the VE:

> Assume a hypothetical individual of the claimant's age and education, with the past job you described. Further assume this individual is limited to sedentary work, with the following additional limitations. Occasional ramps and stairs. No ladders, ropes or scaffolds. The other posturals would be occasional: Balance, stoop, kneel, crouch, and crawl. No unprotected heights, moving mechanical parts, or operating a motor vehicle. That hypothetical individual cannot perform that past job. Correct?

(Tr. 59). The VE testified that such an individual could not perform Plaintiff's past relevant work as a registered nurse. The individual could:

> Perform work such as a Food and Beverage Order Clerk, [Dictionary of Occupational Titles] DOT #209.567-014. There are over 100,000 people employed in the nation. The Dictionary classifies the work as sedentary, unskilled, with an SVP of 2. Another job would be that of a Surveillance System Monitor, DOT #379.367-010. There are over 100,000 people employed in the nation. The Dictionary classifies the work as sedentary, unskilled, with an SVP of 2. Another job such a hypothetical work could perform would be that of a Touch-

9

> up Screener, Printed Circuit Boards, DOT #726.684-110. There are over 100,000 people employed in the nation. The Dictionary classifies the work as sedentary, unskilled, with an SVP 2.

(Tr 59-60).

The ALJ posed a second hypothetical as follows: "Same hypothetical individual, same limitations as before, but in addition, this individual would require the use of a cane for ambulation. (Tr. 59). The VE testified it would not change his answers to the first hypothetical; and further testified: his response was not based on the DOT, because "[t]he Dictionary does not address the use of a cane. My opinion is based on my experience having done job analysis and labor market surveys." (Tr. 60).

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

The Commissioner determines whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a medically determinable "severe impairment" or

combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s) does not prevent her from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent her from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

### IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

(1) The claimant last met the insured status requirements of the Social Security Act on June 30, 2018.

(2) The claimant did not engage in substantial gainful activity during the period from her alleged onset date of March 15, 2017 through her date last insured of June 30, 2018 (20 CFR 404.1571 *et seq*.)

(3) Through the date last insured, the claimant had the following severe impairments: status post left total knee arthroplasty; status post right knee arthroscopy; osteoarthritis; degenerative disc disease of the cervical and thoracic spine; obesity (20 CFR 404.1520(c)).

(4) Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

11

>(5) After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except: requires use of a cane for ambulation; occasional climbing of ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch, crawl; and no work at unprotected heights, never moving mechanical parts, never operate a motor vehicle.
>
>(6) Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).
>
>(7) The claimant was born on *** 1972 and was 45 years old, which is defined as a younger individual age 45-49, on the date last insured (20 CFR 404.1563).
>
>(8) The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).
>
>(9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR 404, Subpart P, Appendix 2).
>
>(10) Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).
>
>(11) The claimant was not under a disability, as defined in the Social Security Act, at any time from March 15, 2017 the alleged onset date, through June 30, 2018, the date last insured (20 CFR 404.1520(g)).

(Tr. 12, 13, 14, 16, 17)

### V. Law and Analysis

**A. Standard of Review**

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial

12

evidence, regardless of whether it has actually been cited by the ALJ. *Id*. However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B. Plaintiff's Assignments of Error**

The court considers Plaintiff's second assignment of error first because it finds that claim well-taken as explained herein.       .

### 1. Evaluation of Listing 1.02 and 1.03

Plaintiff's second assignment of error asserts that the ALJ erred when assessing Plaintiff's residual functional capacity (RFC) by failing to properly evaluate the totality of the evidence in the record in accordance with the applicable Listings and Rulings. (R. 12). Specifically, that the ALJ failed to adequately evaluate Listings 1.02 (concerning major dysfunction of a joint), 1.03 (concerning her total knee arthroplasty), and 1.04 (disorders of the spine). (R. 12 PageID# 1789). Because the undersigned finds the ALJ erred when considering Listings 1.02 and 1.03, it recommends remanding this matter for further consideration.

Plaintiff bears the burden at Step Three to establish that her impairments meet a listed impairment. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir 2004). "For a claimant to

show that [her] impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). In addition, the criteria must be met for a period of twelve consecutive months. 20 C.F.R. § 404.1509

To meet Listing 1.02, Plaintiff must establish that she has a major dysfunction of a joint characterized by gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint, and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint with involvement of one major peripheral weight being-joint resulting in inability to ambulate effectively as defined in 1.00B2B. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02. Similarly, to meet Listing 1.03, Plaintiff must establish that she has had "[r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.03. The record shows MRIs of Plaintiff's left and right knees confirmed osteoarthritis, medical records document limitations in range of motion, and Plaintiff underwent a left total knee arthroplasty on October 19, 2017, and, just after her date last insured, a right knee arthroscopy in August 2018. (Tr. 368-69, 477-78, 499-502, 1318-19, 1333-34, 1337, 1343-51). Therefore, Plaintiff's argument centers upon whether she satisfied the "ineffective ambulation" prong of either Listing 1.02 or 1.03. (R. 12, PageID# 1790). As explained herein, the court agrees with Plaintiff that the ALJ's decision failed to adequately consider those Listings and did not identify substantial evidence demonstrating Plaintiff's ability to ambulate effectively.

As an initial matter, the Commissioner's contention that Plaintiff has presented an undeveloped and conclusory argument regarding the listings is not well taken. (R. 16, PageID# 1827-28). The Plaintiff's brief including the Statement of Facts, summary of Plaintiff's testimony, and the second assignment of error address pertinent medical imaging, surgical notes, and the need for an ambulatory aid, all of which could reasonably support a conclusion that Plaintiff's impairments met or equaled a listing level impairment. (R. 12, PageID# 1777-79, 1787-90).

The Commissioner also contends that Plaintiff has not shown an inability to ambulate effectively, as required by Listings 1.02 and 1.03. (R. 16 PageID# 1828). The Social Security Administration defines ineffective ambulation[3] as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities" and "having insufficient lower extremity functioning... to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b. Moreover, to ambulate effectively, an individual must be able to sustain "a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living" and must be able "to travel without companion assistance to and from a place of employment or school." *Id*. The regulations provide the following examples of ineffective ambulation:

> [T]he inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

---

[3] The Social Security Administration revised how musculoskeletal impairments are evaluated as of April 2, 2021. 85 Fed.Reg. 78164.

*Id*.

The ALJ listing analysis found, in its entirety, that Plaintiff did not meet listing 1.02 (concerning major dysfunction of a joint), because Plaintiff "does not have gross anatomical deformity in her affected joints-her knees-with an inability to ambulate effectively." (Tr. 13). The ALJ found, in its entirety, that Plaintiff did not meet listing 1.03 (concerning her total knee arthroplasties) because "her testimony shows that, although she uses a cane, she can ambulate effectively enough to sufficiently complete her activities of daily living and attend all of her appointments outside of the home." (Tr. 13-14).

However, "A bald declaration that a claimant does not have an impairment or combination of impairments that meet or medically equal any of the listed impairments of Appendix 1 is "completely inadequate."" *Crayton v. Comm'r of Soc. Sec*. No. 3:17-cv-675-DW, 2018 WL 3370565 (W.D. KY July 10, 2018) *citing Weisgarber v. Colvin,* No. 3:13-CV-426-TAV-CCS, 2014 WL 3052488, at *4–5 (E.D. Tenn. July 3, 2014) (*citing Reynolds v. Comm'r of Soc. Sec*. 424 Fed.Appx. 411, 415-16 (6th Cir. 2011) (The ALJ must "actually evaluate the evidence, compare it to ... the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review." Failure to do so makes it "impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.").

As shown above, the ALJ's conclusory statements and vague reference to Plaintiff's ability to complete activities of daily living, without explaining what ADLs and records were considered, is inadequate to permit meaningful judicial review of the ALJ's findings. Moreover, the Commissioner's attempt to identify testimony and record citations, not referenced by the ALJ, to explain retroactively what the ALJ meant by "activities of daily living" does not cure the ALJ's insufficient analysis of the Listings. (R. 17, PageID# 1828); *see Crayton*, 2018 WL

3370565 at *8. Although the ALJ generally refers to Plaintiff's "testimony" regarding activities of daily living and appointments and declared Plaintiff could ambulate effectively (Tr. 14), the ALJ provided no record citation and did not evaluate other forms of evidence, such as, objective medical findings from Plaintiff's providers, throughout 2017 and 2018, documenting an antalgic gait, left and right knee impairments, surgical interventions, and the need for ambulatory aides—as detailed *supra*. The ALJ's consideration of the listings lacks substantial evidence, fails to build a logical bridge between the record evidence and the ALJ's determination, and prevents the court from performing a meaningful review of the ALJ's consideration of the record as it pertains to meeting or equaling Listings 1.02 and 1.03.

Furthermore, the mere fact Plaintiff could perform activities of daily living in her home and attend appointments does not automatically establish effective ambulation. As noted, the ALJ did not identify specific records supporting the listing determination, but to the extent it could be argued he implicitly referenced Plaintiff's home activities, such reference without sufficient explanation would be suspect. For example, "The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b. In addition, although some records referenced above note that Plaintiff had at times a normal or improving gait on examination, "If the ability to walk independently in one's home is not, itself, indicative of effective ambulation, the undersigned sees no reason why the ability to ambulate independently in an examination room would be sufficient." *Zerkel v. Comm'r of Soc. Sec*. No. 3:19-cv-274, 2020 WL 3286457, *4 (June 18, 2020) ("Thus, the undersigned concludes that the mere fact Plaintiff ambulated independently on examination is not substantial evidence upon which an ALJ can conclude that Plaintiff can ambulate effectively, i.e., "walk a block at a reasonable pace on

rough or uneven surfaces"; or "climb a few steps at a reasonable pace with the use of a single hand rail[.]" quoting *Moss v. Astrue*, 555 F.3d 556, 563 (7th Cir. 2009)).

As in *Moss*, the ALJ and the Commissioner have not sufficiently considered numerous impairments and limitations referenced *supra* regarding Plaintiff's ability to perform some household chores, including the need to rest, not lifting items, preparing meals that just required reheating, only driving short distances, and not going places where she had to walk beyond 20 feet on uneven services. Based on the foregoing, the undersigned finds the ALJ's reasoning regarding Listings 1.02 and 1.03 inadequate and not supported by substantial evidence.

### The ALJ's Error Was Not Excusable Harmless Error

The ALJ's error to adequately evaluate Listings 1.02 and 1.03 is not harmless. The Sixth Circuit has explained that the regulations indicate that "if a person is found to meet a Listed Impairment, they are disabled within the meaning of the regulations and are entitled to benefits; no more analysis is necessary." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). (*citing* 20 C.F.R. § 404.1520(a)(4)(iii)).

Although the record may contain evidence that could lead one to conclude Plaintiff was/has been unable to ambulate effectively, the undersigned makes no such determination as it recommends remanding this matter for further consideration. In addition, looking beyond the ALJ's finding at Step 3 to his discussion at Step 4, the only mention of Plaintiff's ability to ambulate or her gait occurred when the ALJ referenced Plaintiff's limping due to severe knee pain and the use of a cane. (Tr. 15). In light of clinical findings regarding abnormal or antalgic gait, MRIs confirming knee osteoarthritis, and documentation of joint replacement, and the use of assistive devices a remand is required to more thoroughly consider the record to determine

whether Plaintiff met or equaled Listing 1.02 or 1.03. On remand, the ALJ should conduct a full analysis of the Listings and otherwise assess Plaintiff's disability status anew.

### 2. Remaining Assignments of Error

In the first assignment of error, Plaintiff argues the appointment of the Commissioner violated the separation of powers and the decision is constitutionally defective. (R. 12, PageID# 1785). In her third assignment of error, Plaintiff asserts the ALJ's decision was not supported by substantial evidence and violated Social Security Ruling 16-3p. *Id* at PageID# 1795. Because the court recommends remanding this action based on Plaintiff's second assignment of error, the court declines to address these remaining arguments. The court does not express any opinion regarding the constitutionality of the decision, the RFC, or whether the ALJ complied with the requirements of Social Security Ruling 16-3p. But because the undersigned finds a need for remand, if adopted, the Commissioner would have an opportunity to render a new decision that considers all of Plaintiff's alleged errors.

## VI. Conclusion

For the foregoing reasons, it is recommended that the Commissioner's final decision be REVERSED and REMANDED for proceedings consistent with this opinion.

*s/ David A. Ruiz*
David A. Ruiz
United States Magistrate Judge

Date: February 2, 2022

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.** *See Berkshire v. Beauvais,* **928 F. 3d 520, 530-31 (6th Cir. 2019).**

19